**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

**FILED
SCRANTON**

FEB 1 5 2006

Per_____
DEPUTY CLERK

SHERROCK BROTHERS, INC.,    :

        Petitioner,    :

    v.    :    CIVIL ACTION

        :

DAIMLERCHRYSLER MOTORS    :    NO. 06-CV-_____
COMPANY, LLC,    :

        Respondent.    :

3: CV 06 0351

## PETITION TO VACATE ARBITRATION AWARD
## AND REMAND TO ARBITRATION

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), Petitioner

Sherrock Brothers, Inc. ("Sherrock"), by its undersigned counsel, hereby files this

Petition to Vacate the Arbitration Award entered on or about November 18, 2005

in American Arbitration Association ("AAA") Matter No. 14 117 02299 03.  In

support of this Petition, Sherrock avers as follows:

### INTRODUCTION

1.    Sherrock instantly appeals from the above-referenced commercial

Arbitration proceedings on the grounds that the majority arbitrators were guilty of

misconduct by/or grossly exceeding their powers under the AAA Rules of

Commercial Rules of Arbitration by summarily dismissing Sherrock's claims on

the basis of a summary judgment motion without affording Sherrock of its

fundamental rights to engage in discovery and present testimony and evidence at a hearing on the merits of its claims. At the same time the majority arbitrators deprived Sherrock of these fundamental rights, they also manifestly disregarded and ignored well established law by attempting to support their improper award by relying upon legal doctrines which clearly have no application to the instant matter. To correct these gross injustices, Sherrock respectfully requests that the Arbitration Award be vacated and that this matter be remanded to a new panel of duly constituted AAA commercial arbitrators to proceed with an evidentiary hearing and ruling on the merits of Sherrock's claims in accordance with the AAA Rules for Commercial Arbitration.

## PARTIES

2.     Sherrock is a Pennsylvania business corporation which maintains its principal place of business at 369 South Poplar Street, Hazleton, Pennsylvania 18201. Prior to the events in question, Sherrock owned and operated a Dodge Dealership in Hazleton, Pennsylvania. Sherrock's counsel in this matter is set forth below. Its attorneys in the Arbitration proceedings were Arthur L. Pressman, Esq. and Michael L. Cornell, Esq., NIXON PEABODY, LLP, 100 Summer Street, Boston, MA 02110.

3.     Respondent DaimlerChrysler Motors Company, LLC ("DMC") is a Delaware limited liability company which maintains its principal place of business

at P.O. Box 218001, Auburn Hills, Michigan 48321-8001.  Moreover, DMC has

designated the Corporation Trust Company, 1209 Orange Street, Wilmington, DE

19801, as its registered agent for, inter alia, service in accordance with applicable

law.  At all times relevant hereto, DMC was licensed to and did transact business

in Pennsylvania.  DMC's attorneys during the Arbitration proceedings in question

were Robert D. Cultice, Esq. and Timothy R. Shannon, Esq., HALE AND DORR

LLP, 60 State Street, Boston, MA  02109.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Petition to Vacate the above-

referenced AAA Arbitration Award, which arises out of the parties' September 13,

1994 Agreement (discussed, supra), pursuant to the Federal Arbitration Act, 9

U.S.C. §§ 1 et seq., as well as 28 U.S.C. § 1332.   As regards the latter

jurisdictional grounds, the parties hereto are citizens of different states and the

matter in controversy, exclusive of interest and costs, exceeds $75,000.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391

because, inter alia, DMC is subject to personal jurisdiction in this judicial district.

Cortez Byrd Chips, Inc. v. Bill Harhart Constr. Co., 529 U.S. 193 (2000).

6.      As set forth below, there was no "hearing" held in the underlying

Arbitration proceedings.  That is one of the principal reasons why Sherrock seeks

to vacate the Arbitration Award.  All written submissions in the Arbitration

proceedings were directed to the AAA at 950 Warren Avenue, East Providence, RI 02914.

## FACTUAL ALLEGATIONS

7.     Pursuant to a Sales and Service Agreement dated September 13, 1994, a true and correct copy of which is attached as Exhibit 1 to the Appendix of Exhibits ("Appendix") filed contemporaneously herewith in support of this Petition, Sherrock was authorized by DMC's predecessor, Chrysler Corporation ("Chrysler"), to operate a Dodge Dealership in Hazleton, Pennsylvania.   That Agreement contains the arbitration clause upon which the underlying arbitration proceedings were based.

8.     From September 13, 1994 until January 25, 2002, Sherrock was owned and operated by Theodore Sherrock and his father, Edward Sherrock (collectively, the "Sherrocks").

9.     In late 2001, the Sherrocks approached Robert V. Rinaldi ("Rinaldi"), the owner of multiple other automobile dealerships in the Hazleton, Pennsylvania area, and engaged in discussions regarding certain financial difficulties Sherrock was experiencing.

10.     As a result of those discussions, Rinaldi agreed to provide Sherrock with working capital in exchange for controlling shares of Sherrock's stock and certain other mutual promises by the Sherrocks.   This Agreement was formalized

by instrument dated January 25, 2002, pursuant to which Rinaldi acquired, <u>inter alia</u>, all of the Class "A" Voting Shares of Sherrock in exchange for the payment of $45,000. (A true and correct copy of the January 25, 2002 Agreement is attached as Appendix Exhibit 2.) Under that Agreement, the Sherrocks remained as officers of Sherrock **but were specifically obligated to obtain the approval of Rinaldi, Sherrock's sole voting shareholder, for all corporate actions.** (<u>Id</u>. at pp. 4-5, ¶ 7(c); emphasis added.)

11.    By Resolution dated February 20, 2002, Sherrock's Board of Directors duly adopted and approved the January 25, 2002 Agreement. (True and correct copies of the February 20, 2002 Corporate Resolution and Minutes from the meeting of Sherrock's Board of Directors are collectively attached as Appendix Exhibit 3.)

12.    Thereafter, on February 21, 2002, Theodore Sherrock, Sherrock's President, caused Articles of Amendment to be filed with the Pennsylvania Corporation Bureau to reflect, <u>inter alia</u>, the creation of the two classes of stock (<u>i.e.</u>, Class A voting and Class B non-voting) pursuant to the aforementioned Agreement.    (A true and correct copy of Sherrock's Amended Articles of Incorporation is attached as Exhibit 4.)

13.    By letter dated April 4, 2002, a true and correct copy of which is attached hereto as Appendix Exhibit 5, Rinaldi's counsel advised DMC, through its

Zone Manager, of Rinaldi's investment and equity ownership interest in Sherrock and requested that DMC advise as to whether or not DMC required any forms or other documentation to effectuate Rinaldi's capital contribution to Sherrock and/or acquisition of Sherrock stock. (Id.)

14.   By separate letter also dated April 4, 2002, a true and correct copy of which is attached as Appendix Exhibit 6, Rinaldi's counsel similarly advised DMC's legal counsel of Rinaldi's shareholder status in Sherrock.

15.   The following day, April 5, 2002, Sherrock Stock Certificates Nos. 3 and 4, representing all of the Corporation's voting shares of stock, were issued to Rinaldi. (See Stock Certificates collectively attached as Appendix Exhibit 7.)

16.   By letter dated April 16, 2002, a true and correct copy of which is attached as Appendix Exhibit 8, DMC, through its Zone Manager, acknowledged receipt of the foregoing notice of Rinaldi's ownership interest in Sherrock.

17.   Thereafter, by letter dated May 13, 2002, a true and correct copy of which is attached as Appendix Exhibit 9, DMC, through its counsel, acknowledged receipt of the January 25, 2002 Agreement between Rinaldi and the Sherrocks – **which Agreement clearly required that Rinaldi, as the sole owner of the Class A voting shares of Sherrock stock, approve of all corporate actions (Appendix Exhibit 2 at pp. 4-5, ¶ 7(c)** – and requested that **Rinaldi** remit payment on Sherrock's outstanding credit lines with DMC.

6

18.    DMC, again through its counsel, sent **Rinaldi** a similar letter on July
12, 2002, a true and correct copy of which is attached as Appendix Exhibit 10,
again demanding payment on Sherrock's outstanding debt to DMC and suggesting
that if said payment was not forthcoming, the Sherrock Dealership should be
voluntarily surrendered to DMC.  Attached to DMC's July 12, 2002 letter was a
proposed Voluntary Surrender letter to be used to effectuate the voluntary
surrender of the Sherrock Dodge Dealer Franchise to DMC in the event Sherrock's
outstanding debt was not satisfied.  Significantly, in recognition of its awareness of
Rinaldi's control over Sherrock's corporate actions, DMC's proposed Voluntary
Surrender form **was only to be signed by Rinaldi** and specifically acknowledged
that the approval of a quorum of Sherrock's Board of Directors and the owners of
100% of Sherrock's issued and outstanding common stock was required in order to
take the official, and obviously drastic, corporate action of voluntarily surrendering
the Sherrock Dealership to DMC.  (Id.)

19.    Subsequent to the aforementioned communications from DMC,
Rinaldi, in furtherance of his acquisition of 100% of the voting shares of Sherrock
stock, and with the specific intent to not only maintain the Sherrock Dodge
Dealership but also to expand and improve Sherrock's operations, infused
approximately $612,000 more into Sherrock's operations, representing payment of
$387,000 to DMC on Sherrock's outstanding debt to DMC and another $225,000

in working capital. (See Rinaldi Affidavit, a true and correct copy of which, without exhibits, is attached as Appendix Exhibit 11, at ¶ 12.) During that time period, Rinaldi was also involved in numerous discussions/communications with DMC regarding, inter alia, his involvement in the Sherrock Dodge Dealership, during which Rinaldi was assured that DMC would not undertake any actions to impair his investment in Sherrock. (Id. at ¶ 9.)

20.     Before Rinaldi infused this additional capital into Sherrock, however, DMC had begun pressuring the Sherrock's to either surrender or sell their Dealership because of Sherrock's mounting financing difficulties. By mid-August, 2002, the Sherrocks started to give in to DMC's foregoing pressures. To this end, attached as Appendix Exhibit 12 is a true and correct copy of a letter Theodore Sherrock, Sherrock's President, sent to DMC purporting to authorize DMC to begin searching for a qualified purchaser for Sherrock's assets.

21.     Over the course of the ensuing weeks, however, Rinaldi and the Sherrocks continued their dialogue about the prospects of, inter alia, Rinaldi further capitalizing the Sherrock Dealership. As a result of those productive discussions, Theodore Sherrock again wrote to DMC on September 9, 2002 and directed DMC to "totally disregard my former letter to you dated April 15, 2002 soliciting you to find a buyer for my Dealership." (A true and correct copy of

Theodore Sherrock's September 9, 2002 letter is attached as Appendix Exhibit 13.)

In that same letter, Theodore Sherrock also advised DMC that:

> **Through further negotiations we are finalizing our agreement with Robert Rinaldi as to the disposition of my Dealership and Dodge Franchise. [Emphasis added.]**

22.     Thereafter, by supplemental letter dated September 30, 2002, a true and correct copy of which is attached as Appendix Exhibit 14, Theodore Sherrock advised DMC that Sherrock obtained a new vehicle floor plan line of credit – one of the major deficiencies previously noted by DMC – through Rinaldi. DMC was advised in that same letter to contact either Mr. Sherrock or Rinaldi if it had any further questions concerning the new line of credit being arranged by Rinaldi.

23.     By letter dated October 18, 2002, a true and correct copy of which is attached as Appendix Exhibit 15, DMC followed up on the foregoing communications from Mr. Sherrock by requesting that he provide certain information by October 25, 2002 concerning, inter alia, Sherrock's line of credit as well as clarification of the management/ownership interests in Sherrock that resulted from the Sherrocks' dealings with Rinaldi.

24.     By letter dated October 24, 2002, a true and correct copy of which is attached as Appendix Exhibit 16, Mr. Sherrock formally responded to DMC's October 18, 2002 inquiries by advising DMC, inter alia:

-   that he had pledged all of the stock and assets of Sherrock to Rinaldi in exchange for Rinaldi's "much-needed infusion of cash"; and

-   that Rinaldi was assisting Sherrock to obtain a new floor plan line of credit from M&T Bank.

25.    Although DMC was already agitated over Rinaldi's refusal to accede to certain of the demands DMC sought to impose on him during their on-going discussions throughout 2002 regarding his role in Sherrock's affairs, DMC's agitation intensified when Mr. Sherrock confirmed in his October 24, 2002 letter that Rinaldi actually controlled all of Sherrock's stock and assets.

26.    After receiving his October 24, 2002 letter, DMC, in a clandestine attempt to wrest the Sherrock Dealership away from Rinaldi, advised Theodore Sherrock that because he was still the President of Sherrock, he had the ability – without Rinaldi's knowledge or consent – to voluntarily surrender the Dealer Franchise to DMC.  It also threatened Mr. Sherrock by telling him that if he did not surrender the Dealership to DMC, it would "padlock the door . . . and take everything" and, thereafter, black list him from ever working in the business again. (See April 8, 2005 2004 examination of Theodore Sherrock in the Bankruptcy proceedings docketed at No. 5-04-55646 (U.S. Bank. Ct. Middle District of Pennsylvania), the pertinent excerpts of which are attached as Appendix Exhibit 17, at pp. 45-46.)

27.    Obviously fearing that DMC would carry through with its foregoing threats, the Sherrocks succumbed to DMC's pressures by secretly sending a letter to DMC dated November 11, 2002, a true and correct copy of which is attached hereto as Appendix Exhibit 18, purportedly terminating Sherrock's franchise agreement with DMC. Significantly, however, that letter was void ab initio since it was admittedly submitted to DMC without any notice whatsoever to Rinaldi and, in violation of the January 25, 2002 Agreement between Rinaldi and the Sherrocks, without any affirmative vote or authorization by Rinaldi, Sherrock's sole voting shareholder.

28.    Upon information and belief, the November 11, 2002 letter was actually prepared by, or on behalf of, DMC, and presented to the Sherrocks for their signatures in furtherance of DMC's conspiracy to wrest the Sherrock Dealer Franchise away from the unsuspecting Rinaldi. To this end, the November 11, 2002 letter was not written on Sherrock's regular letterhead. (Compare Appendix Exhibit 18 with Appendix Exhibits 12, 13, 14, and 16.) Furthermore, even though the November 11, 2002 letter was not stamped as being received by DMC until November 14, 2002, (Appendix Exhibit 18), by letter dated November 12, 2002 – two days before DMC purportedly received the November 11, 2002 termination letter – DMC responded to that termination letter by advising Theodore Sherrock of certain procedures to be followed to effect the orderly transition which resulted

from Sherrock's purported voluntary surrender of the franchise to DMC. (A true and correct copy of DMC's November 12, 2002 letter is attached as Appendix Exhibit 19.)

29.    Thereafter, by letter dated December 12, 2002, DMC advised the Pennsylvania State Board of Vehicle Manufacturers Dealers and Salespersons (the "Board") that it was terminating the Sherrock Dodge Dealer Agreement. (A true and correct copy of DMC's December 12, 2002 to the Board is attached as Appendix Exhibit 20.) It was only when Rinaldi received a copy of DMC's December 12, 2002 letter, on or about December 16, 2002, that he learned of the foregoing devious attempts by the Sherrocks to voluntarily terminate Sherrock's Franchise Agreement with DMC. (See Rinaldi Affidavit, Appendix Exhibit 11, at ¶ 23.)

30.    On December 23, 2002, Rinaldi, acting in the name of and on behalf of Sherrock, petitioned the Board to, inter alia, stay the termination of the Sherrock Dodge Dealership, order the parties to submit to mandatory mediation in accordance with Section 11 of the Pennsylvania Board of Vehicles Act, 63 P.S. § 818.11, and, in the event said mediation was unsuccessful, hold a fact finding session to determine the validity of the termination of Sherrock's franchise Agreement. (A true and correct copy of Sherrock's Petition to the Board is attached as Appendix Exhibit 21.)

31.   On December 24, 2002, the Board issued an Order for Stay, a true and correct copy of which is attached as Appendix Exhibit 22, directing the parties to meet with a mediator in accordance with 63 P.S. § 818.11 and staying the termination of the Sherrock Franchise Agreement pending a final determination by the Board.

32.   On April 14, 2003, after the Board-ordered mediation failed to resolve the parties' disputes, DMC filed a Motion for Summary Judgment with the Board, claiming, inter alia, that Sherrock's Petition failed to state a claim under Section 13 of the Vehicle Act.

33.   Sherrock opposed DMC's Motion by Answer dated April 14, 2003 and Brief dated May 9, 2003, in which Sherrock argued, inter alia, that its Petition not only stated a valid claim but that summary judgment was an improper method for resolving Sherrock's Petition and that Sherrock was entitled to a hearing on the merits of its challenge to the termination of the Sherrock Dealer Franchise.

34.   Notwithstanding said arguments, by Adjudication and Order dated June 16, 2003, a true and correct copy of which is attached as Appendix Exhibit 23, the Board summarily dismissed Sherrock's Petition on the grounds that it failed to state a claim upon which relief could be granted.  More specifically, the Board – **without conducting any evidentiary hearing** – found that the Sherrocks' November 11, 2002 letter of termination to DMC was a "voluntary act" on the part

13

of Sherrock and, therefore, beyond the purview of Section 13 of the Vehicle Act. (Id.) Significantly, however, with respect to the ultimate issue of whether the November 11, 2002 termination letter purportedly sent by the Sherrocks was binding upon Sherrock as a matter of corporate law, the Board specifically held that it had neither the authority nor expertise to deal with such issue. (Id. at p. 6.)

35. On June 26, 2003, Sherrock filed an Application to the Board requesting reconsideration of its Order dismissing Sherrock's Petition. Without hearing, Sherrock's Application for Reconsideration was dismissed by the Board on July 15, 2003. (A true and correct copy of the Board's July 15, 2003 Order is attached as Appendix Exhibit 24.)

36. On or about July 14, 2003, Sherrock filed a Petition for Review with the Pennsylvania Commonwealth Court, a true and correct copy of which is attached as Appendix Exhibit 25, in which Sherrock argued, inter alia, that the Board erred in finding that the November 11, 2002 letter was a "voluntary act" without any evidentiary consideration whatsoever of whether that letter was lawfully issued, legally effective and/or binding upon Sherrock. (Id.)

37. In the meantime, on or about October 3, 2003, Sherrock, upon learning that DMC was about to issue a Dodge Franchise to another Dealer in the Hazleton, Pennsylvania area, filed a Complaint and Petition for Preliminary Injunction against the Sherrocks and DMC in the Court of Common Pleas of

Luzerne County, Pennsylvania (the "State Court Action").   In the State Court Action, Sherrock sought, <u>inter alia</u>, a declaratory judgment that the November 11, 2002 "voluntary termination" of the DMC Dealer Agreement was void as well as a preliminary injunction prohibiting DMC from appointing a new Dealer to replace Sherrock.

38.   Prior to any evidentiary hearing in the State Court Action or any decision on any issue implicated in that proceeding, however, Sherrock voluntarily discontinued the State Court Action, without prejudice.

39.   As soon as Sherrock withdrew the State Court Action, DMC awarded the Hazleton Dodge Franchise to the Wright Motor, Berger family dealerships which, thereupon, promptly turned around and hired Theodore Sherrock as one of its employees.   Upon information and belief, DMC, as a reward for the Sherrocks' assistance in attempting to voluntarily surrender the Sherrock Dealership back to DMC behind Rinaldi's back, arranged for Theodore Sherrock's employment by the Wright Motor, Berger family dealership.

40.   By Order dated January 8, 2004, a true and correct copy of which is attached as Appendix Exhibit 26, the Commonwealth Court affirmed the Board's dismissal of Sherrock's Petition on the grounds that Section 13 of the Vehicle Act did not apply to Sherrock's alleged "voluntary termination" of the Dodge Dealership Franchise Agreement.   In so finding, the Commonwealth Court, like the

Board had done earlier, held that Rinaldi had other judicial recourse if he wished to challenge the validity of the November 11, 2002 letter upon which Sherrock's Dodge Dealership was terminated. (Id. at p. 6.)

41.     On or about February 2, 2004, the Commonwealth Court denied Sherrock's application for reargument/reconsideration before the Court en banc.

42.     Thereafter, on or about March 29, 2004, Sherrock filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court, which Petition was denied by Order dated August 5, 2004.

43.     In the meantime, on October 22, 2003, after it voluntarily withdrew the State Court Action, Sherrock filed a formal demand with the AAA pursuant to Section 9 of the Franchise Agreement.  Pursuant to its Arbitration Demand, a true and correct copy of which is attached as Appendix Exhibit 27, Sherrock challenged the validity of the termination of its Dodge Dealer Franchise.  The relief sought by Sherrock in its Arbitration Demand included reinstatement of its Dealer Contract, recoupment of the lost profits during the period when Sherrock was unable to operate without its Dealer Contract and recoupment of the value of Sherrock's Dealer Contract and the business to be represented thereby.  (Id.)  Significantly, the core issue underlying each of these claims – that the November 11, 2002 "voluntary surrender" of the Sherrock Franchise was a legal nullity – was never decided by either the Board or the Commonwealth Court.

44.    As it had done in the Board proceedings, DMC sought to prevent Sherrock and Rinaldi from having their day in Court – and thereby expose DMC's illicit role in the contrived, but invalid, "termination" of the Sherrock Dealer Franchise – by filing a Motion for Summary Judgment.   In its Motion and supporting Brief, true and correct copies of which are attached collectively as Appendix Exhibit 28, DMC argued, inter alia, that Sherrock's arbitration claims were barred by the doctrines of res judicata and/or collateral estoppel and, also, that Sherrock waived its right to arbitration by initiating the aforementioned Board proceedings.   As set forth below, DMC is clearly wrong on both counts.

45.    Sherrock vigorously opposed DMC's Summary Judgment Motion for several reasons:    (a) summary judgment is inappropriate in the context of commercial arbitration; (b) even if summary judgment were available, newly acquired evidence in the form of Theodore Sherrock's April 8, 2005 testimony in the above-referenced Bankruptcy proceedings, which was obtained long after the administrative proceedings before the Board and Commonwealth Court had concluded, and which clearly suggests that DMC conspired with the Sherrocks in an attempt to surrender the Dodge Dealership to DMC behind Rinaldi's back, not only rendered summary judgment inappropriate but also warranted further discovery; (c) because neither the Board nor the Commonwealth Court ever decided whether or not the Sherrock's November 11, 2002 "voluntary termination"

was indeed a valid, binding act on the Corporation, and, in fact, expressly declined to do so, Sherrock's claims could not barred by either res judicata or collateral estoppel; and (d) Sherrock did not in any way waive its rights to arbitration by seeking the interim preliminary relief it sought from the Board and, subsequently, the Pennsylvania Court system.  (True and correct copies of Sherrock's Response and Supplemental Letter Brief in Opposition to DMC's Summary Judgment Motion (without exhibits) are collectively attached as Appendix Exhibit 29.)

46.    Nevertheless, by Arbitration Award delivered to the parties on November 22, 2005, a true and correct copy of which is attached as Appendix Exhibit 30, a majority of the Arbitration Panel denied Sherrock's request to engage in discovery, as well as Sherrock's request to present evidence at a hearing on the merits of its claims, and granted DMC's Motion for Summary Judgment.  More, specifically, the majority panel erroneously agreed with DMC that Sherrock's claims were barred by the doctrines of res judicata and collateral estoppel and that Sherrock had waived its right to arbitration. (Id.)

47.    Because, as set forth below, the Arbitration Panel clearly abused and exceeded their powers by granting DMC's Summary Judgment Motion, and also by refusing to allow Sherrock to engage in discovery or present evidence and testimony material to this controversy at an evidentiary hearing, Sherrock hereby respectfully  petitions this Honorable Court to vacate the foregoing Arbitration

Award and remand this matter back to arbitration before a new panel of AAA commercial arbitrators.

## Petition to Vacate Arbitration Award

48.     Sherrock hereby incorporates the preceding paragraphs of this Petition as if the same were set forth more fully herein.

49.     For the reasons set forth more fully below, the Arbitration Award must be vacated pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), as well as the additional, non-statutory basis recognized and adopted in this Circuit. See, e.g., Jeffrey M. Brown Associates, Inc. v. Allstar Drywall & Acoustics, Inc., 195 F. Supp. 2d 681, 684 (3d Cir. 2002) (recognizing that arbitration awards may be vacated where the award is "in manifest disregard of the law," is not "fundamentally rational" or where the record does not justify the arbitrators' determinations).

50.     As a threshold matter, the American Arbitration Association Commercial Arbitration Rules (the "Commercial Rules") – which governed the arbitration proceedings by agreement of the parties – do not authorize Arbitrators to grant a summary disposition of a case. See The Chem-Met Co. v. Metaland International, Inc., Civ. Action No. 96-02548 (D. D.C. Mar. 25, 1998) (vacating Arbitration Award on the grounds that the AAA's Commercial Arbitration Rules – the same rules that governed the instant matter – do not authorize a dispute to be

decided on the basis of a summary judgment motion);[1] <u>Prudential Securities, Inc.</u> <u>v. Dalton</u>, 929 F. Supp. 1411, 1417 ("This Court is of the view the arbitration panel was guilty of misconduct in refusing to hear evidence pertinent and material to the controversy and exceeded their powers in granting the motion to dismiss without hearing such evidence.  The claimant was thereby denied fundamental fairness"); <u>Cofinco, Inc. v. Bakrie & Bros., N.V.</u>, 395 F. Supp. 613 (S.D.N.Y. 1975) (because "basic right to present and test evidence on issues of fact" had been "totally blocked," award must be vacated since the arbitration panel failed to hear material evidence in violation of 9 U.S.C. § 10); <u>Kiewit v. IBEW Local 103</u>, 76 F. Supp. 2d 77, 81 (D. Mass. 1999) (arbitrator "must give each of the parties to the dispute and adequate opportunity to present its evidence and arguments").

51.    In fact, the Commercial Rules which govern this action specifically contemplate that the parties shall be entitled to a hearing at which they may present all testimony and evidence material to the controversy at hand.

52.    Instantly, despite acknowledging that summary disposition of arbitration disputes is a disfavored practice – which is an understatement since it is actually not allowed – the majority arbitrators nevertheless abused and exceeded their powers by summarily deciding this matter on such a basis without affording Sherrock its right to engage in the discovery it requested and without affording

---

[1]  A copy of the <u>Chem-Met</u> decision is attached hereto for the Court's convenience.

Sherrock its right to present testimony and evidence at a hearing in support of its claims. In doing so, the Arbitrators totally blocked and deprived Sherrock of its fundamental right to be heard.

53.     Indeed, Sherrock **HAS NEVER HAD ITS DAY IN COURT** with respect to the ultimate issue of whether the November 11, 2002 letter signed by the Sherrocks was a valid, binding act pursuant to which DMC was authorized to terminate the Sherrock Dodge Dealership. Because both the Board and the Arbitrators improperly decided the proceedings before them on the basis of DMC's Summary Judgment Motions, Sherrock has never been able to call a single witness, or cross examine anyone from DMC, to prove DMC's conspiracy with the Sherrocks to blindside Rinaldi by attempting to terminate the Sherrock Dealership behind his back, after Rinaldi had injected nearly $700,000 into Sherrock's operations and capital improvements, even though both the Sherrocks and DMC knew full well that the Sherrocks were not authorized to take such action without Rinaldi's consent.

54.     Under the same or analogous circumstances, courts have found that arbitrators are guilty of misconduct and/or exceed their powers by granting a dispositive motion and preventing the parties from introducing testimony and evidence pertinent to the issues. See, e.g., The Chem-Met Co. v. Metaland Int'l, Inc., Civil Action No. 96-02548 (D. D.C. Mar. 25, 1998); Sunshine Mining Co. v.

United Steelworkers of Am., 823 F.2d 1289, 1295 (9th Cir. 1987); Prudential Securities Inc. v. Dalton, 929 F. Supp. 1411, 1415 (N.D. Okla. 1996); Cofinco, Inc. v. Bakrie & Bros., N.V., 395 F. Supp. 613 (S.D.N.Y. 1975).

55.     As a result of the Arbitrators' foregoing misconduct, abuse and exceedance of their powers, Sherrock and Rinaldi have been deprived of the very right sought to be promoted through the arbitration process – the right to a full and fair hearing on the merits of its claim.  Because the Arbitrators' foregoing actions not only prejudiced but, indeed, extinguished Rinaldi's fundamental rights to a fair hearing or the merits, the Arbitration Award must be vacated pursuant to Section 10(a) of the FAA.

56.     Even if summary judgment were an available tool in commercial arbitrations, which the foregoing authorities confirm it is not, the arbitrators here nevertheless committed a manifest disregard of the law and woeful abuse of their powers by preventing Sherrock from further probing its claim that DMC unlawfully conspired with the Sherrocks to terminate the Sherrock Franchise – a claim that was neither presented to nor decided by the Board or Commonwealth Court – through discovery.  See, e.g., Fed. R. Civ. P. 56(f); Costlow v. United States, 552 F.2d 560, 564 (3d Cir. 1977); Ward v. United States, 471 F.2d 667, 670-71 (3d Cir. 1973).

57. The arbitrators also erred and disregarded well-established law in finding that Sherrocks claims were barred by the doctrines of <u>res judicata</u> and/or collateral estoppel. Contrary to the Arbitrators' irrational and unsupportable findings, neither the Board nor the Commonwealth Court decided the ultimate issue of whether the Sherrocks had the authority to voluntarily surrender the Sherrock Dealership to DMC without Rinaldi's knowledge or consent – which they clearly did not. Indeed, both the Board and the Commonwealth Court expressly declined to make such a determination. Because the issues decided by Board and Commonwealth Court were not the same as the ultimate issue presented to the Arbitration Panel, and because Sherrock has never had a "full and fair opportunity" to litigate that issue, the doctrines of <u>res judicata</u> and collateral estoppel are simply inapplicable here and the Arbitrators manifestly disregarded and ignored the law in finding otherwise.

58. Finally, the Arbitrators also committed a manifest disregard of the law in finding that Sherrock had waived its right to pursue arbitration. As the record submitted to the Arbitrators plainly demonstrates, the proceedings Sherrock initiated with the Board and subsequently appealed to the Commonwealth Court were interim measures Rinaldi undertook in an attempt to preserve the <u>status quo</u> while its underlying claim against DMC was being decided. Because the law clearly contemplates a party's right to pursue preliminary injunctive relief prior to

pursuing arbitration, see, e.g., Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3d Cir. 1989); Langston v. National Media Corp., 420 Pa. Super. 611, 616-17 (1992); Mid-Atlantic Toyota Distributors, Inc. v. Bott, 101 Pa. Commw. 46 (1986), the Arbitrators' finding of waiver was clearly and manifestly in error.

## Conclusion

WHEREFORE, for any or all of the foregoing reasons, Sherrock hereby respectfully request that this Honorable Court vacate the Arbitration Award and remand this matter back to a new, duly constituted panel of AAA commercial arbitrators to proceed with an evidentiary hearing and ruling on the merits in accordance with the AAA Rules for Commercial Arbitration, together with such other and further relief to which Sherrock may be justly entitled.

Respectfully submitted:

George A. Reihner
Pa. I.D. No. 48419
Kevin C. Quinn
Pa. I.D. No. 53625
Frank J. Tunis, Jr.
Pa. I.D. No. 84264
**WRIGHT & REIHNER, P.C.**
148 Adams Avenue
Scranton, Pennsylvania 18503
(570) 961-1166

Attorneys for Petitioner

DATED:   February 15, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE CHEM-MET CO.,

Plaintiff,

v.

METALAND INTERNATIONAL, INC.,

Defendant.

Civil Action No. 96-02548 (TAF)

**FILED**

MAR 2 5 1998

Clerk, U.S. District Court
District of Columbia

### ORDER

For the reasons set forth in the accompanying memorandum opinion, it is this 25th

day of March 1998 hereby **ORDERED** that the plaintiff's motion for summary judgment (26) is

**GRANTED** and that the defendant's motions for partial summary judgment (23 and 39) are

**DENIED**; and it is further **ORDERED** that the judgment rendered in American Arbitration

Association Case No. 16 199 00195 95 is **VACATED**.



Thomas A. Flannery
United States District Judge

RECEIVED

MAR 3 0 1998

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

**FILED**

MAR 2 5 1996

Clerk, U.S. District Court,
District of Columbia

THE CHEM-MET CO.,

Plaintiff,

v.

METALAND INTERNATIONAL, INC.,

Defendant.

Civil Action No. 96-02548 (TAF)

## MEMORANDUM OPINION

The plaintiff in this case seeks vacatur of an arbitration award entered in favor of the

defendant. Pending before the Court are the parties' cross-motions for summary judgment.

After considering the parties' written submissions, the arguments presented at an oral hearing,

and the applicable law, the Court will grant the plaintiff's motion and vacate the arbitration

award.

## I. Background

The dispute that was the subject of the challenged arbitration involved a breach of

contract. The plaintiff, The Chem-Met Co. ("Chem-Met"), is a Washington, D.C. corporation

that manufactures chemical products. The defendant, Metaland International, Inc. ("Metaland"),

is a New York corporation that purchases raw materials, deposits, and ores from companies in

China and sells and distributes them in the United States. In November 1993, the parties entered

into a contract worth nearly $1 million that called for Metaland to sell Chem-Met 260 metric tons

of molybdenum oxide ("moly"). Metaland was to deliver the moly in fixed quantities over a



thirteen-month period beginning the following month. Soon after the parties entered the contract, Metaland informed Chem-Met that there would be a delay in shipment because its supplier, a plant in China, was having problems with environmental compliance. By September 1994, Chem-Met still had not received the first shipment of moly from Metaland; therefore, it wrote to Metaland, asking that it be compensated for the extra costs it had incurred to obtain replacement moly. Subsequently, in December 1994, Metaland terminated the contract without having delivered any of the promised moly. In its termination letter, Metaland claimed that its nonperformance was excused by the contract's "force majeure" clause, purportedly since a Chinese government agency had prevented Metaland's only supplier from producing the moly.

Chem-Met initiated arbitration proceedings before the American Arbitration Association ("AAA") in June 1995, seeking to recover the nearly $300,000 premium that it had paid for replacement moly. The parties agreed that the arbitration would be conducted pursuant to the AAA's Commercial Arbitration Rules, before a three-member arbitration panel. Discovery, which consisted of depositions and the exchange of interrogatories and documents, commenced in September. On January 17, 1996, two weeks before the initial discovery cut-off and more than two months before the initial deadline for the filing of pre-hearing briefs, Metaland filed a motion for summary judgment.

In its summary judgment motion, Metaland argued that the force majeure clause in the parties' contract excused its nonperformance.[1] Specifically, Metaland maintained that a Chinese

---

[1] The relevant portions of that clause read: "FORCE MAJEURE: In the event of governmental action or acts of the authorities . . . or any other causes whatsoever or event, whether foreseeable or not, beyond any reasonable control of the parties and preventing either Seller from placing the goods at the disposal of the Buyer or Buyer from taking delivery of the

2

government agency had halted its supplier's production of moly. Metaland further argued that it had fulfilled its obligation to search for replacement moly in China, albeit without success. Chem-Met did not respond by filing a summary judgment motion of its own. Rather, it opposed Metaland's motion on the grounds that Metaland had not proven the elements of force majeure and that the existence of significant factual disputes between the parties necessitated a full evidentiary hearing. Chem-Met maintained that the record was unclear as to the following fundamental issues: whether the parties' contract required Metaland to obtain replacement moly from sources outside China; whether Metaland had taken sufficient steps to correct its' supplier's environmental problem; and whether Metaland's search for replacement moly in China had been adequate.

The arbitrators subsequently heard oral argument on Metaland's motion. At that proceeding, the parties presented no live testimony, and the arbitrators admitted no documents into evidence. Following the oral argument, each party filed a supplemental legal memorandum. Then, on June 28, 1996, the arbitrators entered summary judgment in Metaland's favor, without a written opinion.

II. Analysis

Chem-Met now asks this Court to vacate the arbitrators' award, for three reasons. First, it argues that the Court should vacate the award pursuant to 9 U.S.C. § 10(a)(4), because the arbitrators' use of a summary judgment procedure exceeded their powers. Second, Chem-Met

same, the contract shall be suspended during the duration of said hindrance. If such hindrance lasts for more than three months then either party shall have the right to terminate his obligation without prior notice or indemnity for any quantity for which delivery has been hindered by reason of force majeure."

3

claims that the Court should vacate the award pursuant to 9 U.S.C. § 10(a)(3), because the

arbitrators' use of a summary judgment procedure constituted a refusal to hear material evidence.

Finally, Chem-Met alleges that Metaland made false representations to the arbitrators regarding

the environmental difficulties encountered by its supplier. Therefore, Chem-Met maintains that

the Court should vacate the award pursuant to 9 U.S.C. § 10(a)(1), since the award was procured

by fraud.[2] The Court is mindful that its review of arbitral awards is to be narrow and limited.

Nonetheless, it agrees that it was improper for the arbitrators to decide the parties' dispute on

summary judgment, and will vacate the award on that basis.[3]

A. The Arbitrators Exceeded the Scope of Their Powers

The Court will first address Chem-Met's contention that the arbitrators exceeded their

powers by deciding the case on summary judgment. The merits of this claim turn on the AAA's

Commercial Arbitration Rules, which the parties agreed would govern the arbitration

proceedings. Three sections of those Rules are especially relevant here. Section 37 indicates

---

[2] The relevant provisions of the Federal Arbitration Act thus read as follows:

(a) In any of the following cases the United States court in and for the district wherein the award may make an order vacating the award upon the application of any party to the arbitration:
(1) Where the award was procured by corruption, fraud, or undue means.
. . .
(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1), (3), (4).

[3] Accordingly, the Court need not address Chem-Met's fraud claim.

that: "The parties may provide, by written agreement, for the waiver of oral hearings in any case. If the parties are unable to agree to the procedure, the AAA shall specify a fair and equitable procedure." Section 56 further provides that: "Generally, the hearing shall be completed within one day, unless the dispute is resolved by submission of documents under Section 37." Finally, Section 29 provides that, while the arbitrators have the discretion to structure the procedure of the evidentiary hearing, they must "afford a full and equal opportunity to all parties for the presentation of any material and relevant evidence." It is undisputed that the parties did not enter a joint written waiver pursuant to Section 37. Therefore, read together, these provisions seem to support Chem-Met's contention that it was entitled to an evidentiary hearing.

The only provision of the Rules that might indicate otherwise is Section 10. That Section gives the arbitrators discretion to hold preliminary hearings to "specify the issues to be resolved, to stipulate to uncontested facts, and to consider any other matters that will expedite the arbitration proceedings." Metaland suggests that this provision gives the arbitrators the discretion to entertain a summary judgment motion. However, such an interpretation would render Section 10 inconsistent with Section 56. The latter Section strongly implies that, unless the parties enter a Section 37 waiver, the arbitrators must hold an oral evidentiary hearing in every case (the text reads: "Generally, the hearing shall be completed within one day, *unless the dispute is resolved by submission of documents under Section 37*."). (emphasis added). Therefore, while Section 10 authorizes arbitrators to take steps to expedite the proceedings, the Court does not interpret that provision as permitting them to dispense with an evidentiary hearing altogether.

Metaland makes only a weak attempt to dispute the proposition that Chem-Met was

5

presumptively entitled to a hearing. It points first to Section 10, which the Court has just discussed. Next, Metaland suggests that Section 37 itself authorizes the arbitrators to bypass an oral evidentiary hearing, without first obtaining a written waiver from the parties. Here, Metaland relies on the second sentence of the Section, which reads: "If the parties are unable to agree as to the procedure, the AAA shall specify a fair and equitable procedure." This argument is meritless because it takes the quoted sentence out of context. What the sentence clearly means is that, once the parties have agreed to waive an oral hearing, the arbitrators will resolve any dispute as to the substitute procedure. Finally, Metaland cites to two cases, Booth v. Hume Publishing, Inc., 902 F.2d 925 (11th Cir. 1990), and Forsythe International, S.A. v. Gibbs Oil Co. of Texas, 915 F.2d 1017 (5th Cir. 1990), for the proposition that arbitrators may decide a case on summary judgment. This, too, is unpersuasive. While each case does include statements to the effect that arbitrators may conduct expeditious and summary hearings, neither suggests that arbitrators may so expedite the proceedings as to dispense with an evidentiary hearing altogether.

Metaland's better argument is that Chem-Met waived its right to object to the arbitrators' use of a summary judgment procedure by not raising a procedural objection during the arbitration. Here, Metaland relies on Section 38 of the Rules, which provides that: "Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived its right to object." According to Metaland, it was Chem-Met itself that first suggested the possibility that the arbitrators could decide the case on a paper record. More significantly, Metaland notes that Chem-Met opposed Metaland's summary judgment on substantive grounds, but never objected to the arbitrators' use of summary judgment as a

6

procedure.

In the Court's view, Metaland exaggerates the extent to which Chem-Met "encouraged" the arbitrators to decide the case on summary judgment. It is true that, at a very early stage in the proceedings, Chem-Met suggested to the arbitrators that perhaps the key facts would be uncontested and that therefore the parties might be able to submit their dispute for resolution on a procedure analogous to cross-motions for summary judgment. But Chem-Met's early prediction is irrelevant, since it turned out to be entirely wrong-- the parties neither reached agreement on the essential facts nor filed cross-motions for summary judgment. On the contrary, Chem-Met never filed a summary judgment motion of its own and repeatedly asked for an evidentiary hearing.

The far more difficult question is whether Chem-Met's opposition to Metaland's summary judgment motion was sufficient to comply with Section 38's requirements for objections to violations of the AAA's Rules. It is undisputed that, both in its memoranda and at the oral argument on the motion, Chem-Met asserted that the arbitrators needed to hold a full evidentiary hearing to resolve the parties' dispute. However, it is also true that the record is devoid of any indication that Chem-Met explicitly maintained that the arbitrators lacked the authority to grant Metaland's summary judgment motion. Nowhere in its papers before the arbitrators does Chem-Met ever mention Section 37 of the Rules or raise a strictly procedural objection to the arbitrators' use of summary judgment.

Nonetheless, the Court concludes that Chem-Met's repeated written and oral requests for an evidentiary hearing were sufficient to preserve its right to object to the arbitrators' use of a summary judgment procedure. Given those requests, and in the absence of a written waiver from

the parties, the arbitrators were on notice of their duty to hold a hearing in this case. Moreover, since Chem-Met never filed a summary judgment of its own, the Court has difficulty accepting Metaland's argument that Chem-Met somehow tacitly waived its right to an evidentiary hearing. Having determined both that the AAA's Rules entitled Chem-Met to an evidentiary hearing and that Chem-Met preserved its right to object, the Court concludes that the arbitrators exceeded their powers by deciding the case on summary judgment.

B. The Arbitrators Refused to Hear Material Evidence

Alternatively, the Court agrees with Chem-Met that the arbitrators' use of a summary judgment procedure effectively constituted a refusal to hear material evidence, and that the Court may therefore vacate the award pursuant to 9 U.S.C. § 10(a)(3). Courts interpreting that provision have recognized that arbitration is to be a speedy and flexible process. Accordingly, they have given arbitrators great latitude to structure the proceedings before them and to regulate the admission of evidence. Nonetheless, courts have also emphasized that any efficiency in the arbitral process is constrained by the arbitrators' obligation to provide each party a fundamentally fair hearing. See, e.g., Generica, Ltd. v. Pharmaceutical Basics, Inc., 125 F.3d 1123 (7th Cir. 1997) (Federal Arbitration Act demands a "fundamentally fair hearing," including "adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator").

Unfortunately, the cases cited by the parties shed little light on the question of how to assess the fairness of the arbitrators' use of a summary judgment procedure. Despite Metaland's suggestion to the contrary, the instant case is not analogous to those in which courts have recognized an arbitrator's authority to exclude from admission at a hearing evidence that he deems to be cumulative. See, e.g., National Post Office Mailhandlers v. United States Postal

8

Service, 751 F.2d 834, 841 (6th Cir. 1985). However, Chem-Met also overstates its point by analogizing this case to one in which a court vacated an arbitration award after concluding that "the fundamental right to be heard was grossly and totally blocked." See Cofinco, Inc. v. Bakrie & Brothers, 395 F. Supp. 613, 615 (S.D.N.Y. 1975). Here, each party's submissions to the arbitrators were extensively documented and included information touching on all of the key issues in the dispute.

Nonetheless, the Court cannot conclude that the arbitrators here accorded Chem-Met a fundamentally fair hearing. Even recognizing the need for flexibility in arbitration, it is a bedrock principle that each party must be given a full opportunity to present its case at a hearing on the evidence. The AAA's Rules make it clear that deviation from that principle is only legitimate upon the joint, written agreement of the parties. By deciding the case on summary judgment, the arbitrators denied Chem-Met's rights to present its case in full and to test Metaland's case through cross-examination. Accordingly, the Court finds that the arbitrators' use of that procedure effectively constituted a failure to hear material evidence.

III. Conclusion

For the foregoing reasons, the Court will grant Chem-Met's request for vacatur of the arbitrators' award. An appropriate order accompanies this opinion.

3-25-98
Date

Thomas A. Flannery
United States District Judge

9

```
        Wed Feb 15 17:11:52 2006

        UNITED STATES DISTRICT COURT

          SCRANTON       , PA

      Receipt No.   333 105284
      Cashier         tanya

      Check Number:  2121

      DO Code    Div No
       4667        3

      Sub Acct Type Tender     Amount
      1:510000  W    2          190.00
      2:086900  W    2           60.00

      Total Amount      $      250.00

      WRIGHT & REIHNER 148 ADAMS AVE SCRAN
    TON, PA 18503

      NEW CASE FILING FEE SHERROCK V. DAIM
    LER


      An
      Wed Feb 15 17:11:52 2006

      Check No.  2121
      Amount$  250.00
      Pay any Federal Reserve Bank or
      General Depository for credit to
      United States Treasury Symbol 4667
```